**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:22-cv-20187-GAYLES/TORRES**

**ROYAL CARIBBEAN CRUISES LTD., a foreign corporation, d/b/a Royal Caribbean International**,

Plaintiff,

v.

**CAPITAL JAZZ INC., a foreign corporation**,

Defendant.
_______________________________________/

**ORDER**

**THIS CAUSE** comes before the Court upon Defendant/Counterclaim Plaintiff Capital Jazz, Inc.'s ("Capital Jazz") Motion for Summary Judgment, [ECF No. 153], and Plaintiff/Counterclaim Defendant Royal Caribbean Cruises Ltd.'s ("RCCL") Motion for Final Summary Judgment, [ECF No. 156], and Motion for Judgment on the Pleadings as to Count V of Capital Jazz's Second Amended Counterclaim, [ECF No. 157]. The Court has reviewed the Motions and the record and is otherwise fully advised. For the reasons below, Capital Jazz's Motion for Summary Judgment is **GRANTED in part** as to Count II of RCCL's Amended Complaint; RCCL's Motion for Summary Judgment is **GRANTED in part** as to Count V of Capital Jazz's Second Amended Counterclaims and Capital Jazz's First, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Affirmative Defenses; and RCCL's Motion for Judgment on the Pleadings is **DENIED as moot**.

## I. BACKGROUND

This is a breach of contract action to recover monetary damages following the cancellation of a jazz-themed cruise just days before it was set to start amidst the SARS-CoV-2/COVID-19

("COVID-19") pandemic. The parties accuse each other of unilaterally cancelling the cruise. Both parties present conflicting evidence and dispute many of the facts and circumstances surrounding the cancellation.

**A. Factual Background**[1]

On June 1, 2019, Capital Jazz, a music promoter, entered into a Guest Accommodations Purchase and Resale Agreement (the "Agreement") with RCCL for an eight-night voyage on the *M/V Independence of the Seas* (the "Ship") starting on January 16, 2021 (the "Cruise").[2] Capital Jazz organized a music festival that was to take place during the Cruise and bought all available cabins on the Ship from RCCL. It later resold boarding passes for the cabins along with its entertainment for one price, retaining the profits. The Cruise was to set sail from Fort Lauderdale, Florida, and visit ports of call in Jamaica, Bonaire, and Aruba.

Under the Agreement, Capital Jazz agreed to pay RCCL a specified Guaranteed Accommodation Amount and Guaranteed Gratuity Amount, advance Estimated Taxes/NG Fees, and tender a Security Deposit in advance. The Agreement further provided that the Actual Net Onboard Revenue generated during the Cruise had to equal or exceed a certain amount. If the Actual Net Onboard Revenue generated during the Cruise was less than the Guaranteed Onboard Revenue Amount, Capital Jazz agreed to pay RCCL the difference.

[1] The undisputed facts, unless otherwise noted, are taken from Capital Jazz's Statement of Material Facts, [ECF Nos. 152, 159 (under seal)]; RCCL's Response Statement of Material Facts, [ECF Nos. 181, 196 (under seal)]; Capital Jazz's Reply Statement of Material Facts, [ECF Nos. 202, 210 (under seal)]; RCCL's Statement of Undisputed Material Facts, [ECF Nos. 155, 164 (under seal)]; Capital Jazz's Response Statement of Material Facts, [ECF Nos. 183, 192 (under seal)]; RCCL's Reply Statement of Undisputed Material Facts, [ECF Nos. 199, 217 (under seal)]; and a review of the corresponding record citations and exhibits.

[2] The parties refer to the Cruise as the "SuperCruise." However (as explained below), the parties dispute whether the SuperCruise refers to the Ship's *sailing* or the music festival *program* that occurs aboard the Ship. That distinction, Capital Jazz argues, is material because it claims to have only cancelled the program, not the sailing. Unless otherwise noted, the Court uses the term "Cruise" as used in the Agreement. [ECF No. 164-1].

Capital Jazz made payments to RCCL in accordance with the payment schedule specified in the Agreement. The Estimated Taxes/NG Fees covered expected taxes (other than income taxes) and port fees or charges associated with the Cruise. Capital Jazz agreed to pay a Security Deposit by the time of delivering the executed Charter Agreement. Capital Jazz was also required to obtain and maintain commercial general liability insurance ("CGL") throughout the term of the Agreement. [ECF No. 164-1]. The Agreement required Capital Jazz to submit an insurance certificate to RCCL. *Id.*

On March 11, 2020, the World Health Organization ("WHO") declared a global pandemic due to the spread of the COVID-19 virus. On March 14, 2020, the U.S. Centers for Disease Control ("CDC") issued a No Sail Order and Suspension of Further Embarkation prohibiting cruise ships from sailing and embarking passengers. As a result, in August 2020, the parties executed Amendment No. 1 to the Agreement, agreeing to reschedule the Cruise for January 14, 2022. On November 26, 2021, WHO identified the Omicron variant of COVID-19. On December 24, 2021, Capital Jazz and RCCL agreed to modify the Agreement via Amendment No. 2 in response to heightened health and safety issues.

On December 30, 2021, the CDC raised the Travel Health Notice ("CDC's Notice") level for cruise ship travel from Level 3 to Level 4, indicating a "very high level of COVID-19." [ECF No. 152-12]. The CDC's Notice was issued in response to "increases in cases onboard cruise ships since identification of the Omicron variant." *Id.* In response, RCCL increased its COVID-19 protocols, including reserving additional berths for quarantine and reinstating a mask requirement while indoors. On or around December 28, 2021, the President of Capital Jazz, Clifford Hunte, called the Manager of Charter Sales for RCCL, Keri Kane, with questions about the Cruise. Between December 28 and 31, 2021, Hunte also emailed Kane requesting to speak about the

Cruise. On either December 29 or 30, 2021, Kane told Hunte by phone that RCCL's corporate offices were closed for the holidays and that RCCL would address his concerns when the office reopened. Capital Jazz asserts that Kane did not provide "substantive" responses to Capital Jazz's concerns about logistics and safety in light of the CDC's Notice.

On December 31, 2021, Kane followed up with Hunte by email, confirming that RCCL's offices were closed until Tuesday, January 4, 2022. Capital Jazz contends that Kane's supervisor, Craig Jarrett, and RCCL Associate Vice President Freddy Muller were available and could have been reached before January 4th. At Kane's request, Hunte sent her an email on January 3, 2022, detailing Capital Jazz's concerns about proceeding with the sailing in light of the CDC's Notice. Kane responded that same day, telling Hunte that she was forwarding his concerns to leadership for review and would be in touch on January 4th or 5th with more information. On January 4th, Hunte sent Kane several specific questions for RCCL regarding the Cruise. Hunte asked for "the cruise line's official response to the CDC statement from Dec 30." [ECF No. 152 ¶ 46]. Kane replied that "[t]he Cruise Line has no official response. The CDC has recommended guests don't sail, but they have not required [RCCL] to shut down and they are allowing [RCCL] to sail while following their guidelines set forth in the Conditional Sail Order." *Id.* ¶ 50; [ECF No. 152-16].

Hunte also asked Kane what Capital Jazz should do regarding entertainment "if most of the performers withdraw from the cruise due to safety concerns pertaining to the CDC statement." [ECF No. 152 ¶ 47]. In response, Kane asked Hunte, "[h]ow many artists have or say they will cancel? Can other artists come onboard? We can also offer some of RCI's standard entertainment." *Id.* ¶ 51; [ECF No. 152-16]. Hunte asked what RCCL would do if certain specified ports "do not allow us to dock in their ports, which would affect the incoming and outlining downliners." [ECF No. 152 ¶ 48]. Kane responded, "[i]f the confirmed ports refuse our ship, we will use our best

effort to find an alternate port to call upon." *Id.* ¶ 52. On January 5, 2022, unsatisfied with RCCL's response, Capital Jazz notified its performers and artists that the "SuperCruise" would not be going forward. [ECF No. 155 ¶ 51]. However, Capital Jazz did not notify RCCL at that time.

On January 7, 2022, Capital Jazz and RCCL employees attended a telephone conference to discuss the Cruise and scheduled a follow-up call for January 10, 2022. On January 7, 2022, at 11:42 P.M., Capital Jazz emailed its customers that, based on the CDC's Notice, Capital Jazz "asked the cruise line to cancel the SuperCruise sailing due to serious health and safety concerns. After much discussion with them, they ultimately refused to cancel the sailing. However, Capital Jazz has made the decision to cancel next week's SuperCruise program." [ECF No. 152 ¶ 62]. Capital Jazz did not send that email to RCCL. On January 10, 2022, RCCL cancelled the follow-up call because it believed that Capital Jazz had cancelled the Cruise.

By January 7, 2022, Capital Jazz had provided RCCL with a manifest of those traveling on the Cruise, including Capital Jazz's customers. Citing to a screenshot, Capital Jazz claims that, on or about January 10, 2022, RCCL placed a notice on its mobile application that communicated to guests on the manifest that the Cruise was cancelled. *Id.* ¶ 69. The alleged notice states, "[t]his voyage has been cancelled[.] The safety and well-being of our guests and crew is top priority. So, in light of current regional travel conditions, we've made the difficult decision to cancel our voyage." *Id.* ¶ 70; [ECF No. 47-2]. The screenshot does not provide any additional information. RCCL denies sending that notice to Capital Jazz's customers. [ECF No. 196 ¶¶ 69, 70].

**B. Procedural History**

On January 13, 2022, RCCL initiated this action against Capital Jazz, [ECF No. 1], and on March 9, 2022, RCCL filed its two-count Amended Complaint for anticipatory breach of contract (Count I) and breach of contract (Count II), [ECF No. 23]. Capital Jazz answered the Complaint

and Amended Complaint and asserted affirmative defenses and counterclaims. [ECF Nos. 20, 34]. Capital Jazz subsequently filed its seven-count Second Amended Counterclaims on May 25, 2022. [ECF No. 47]. Thereafter, RCCL filed a Motion to Dismiss Counts I through V. [ECF No. 54]. On September 30, 2022, the Court granted dismissal as to Counts I, II, and III with prejudice, and denied the motion as to Counts IV and V. [ECF No. 96].[3]

The parties subsequently filed cross-motions for summary judgment. [ECF Nos. 153, 156]. Capital Jazz seeks summary judgment on RCCL's claims for anticipatory breach of contract (Count I) and breach of contract (Count II) and Capital Jazz's Second Amended Counterclaim for breach of contract (Count VI). RCCL seeks summary judgment in its favor on Counts I and II of its Amended Complaint, Counts IV–VII of Capital Jazz's Second Amended Counterclaims, and all nine of Capital Jazz's Affirmative Defenses. RCCL also moved for judgment on the pleadings as to Count V of Capital Jazz's Second Amended Counterclaims. [ECF No. 157].

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment "is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is "genuine" when a reasonable trier of fact, viewing all the record evidence, could

[3] Capital Jazz later filed a motion for reconsideration as to Counts I and II, which was denied by the Court. [ECF No. 269]. The Court also denied Capital Jazz's Motion for Leave to Amend Defendant's Second Amended Counterclaims. [ECF No. 268].

rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (citation omitted). Furthermore, conclusory allegations will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment. *See, e.g.*, *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (citations omitted). "A district court's disposition of cross-motions for summary judgment employs the same legal standards applied when only one party files a motion." *Certain Underwriters at Lloyds, London Subscribing to Policy No. SA 10092-11581 v. Waveblast Watersports, Inc.*, 80 F. Supp. 3d 1311, 1316 (S.D. Fla. 2015) (citation omitted).

## III. DISCUSSION[4]

The parties' dispute boils down to who breached the Agreement first by cancelling the Cruise. RCCL contends that Capital Jazz unilaterally told employees, staff, and guests that the Cruise was cancelled. Capital Jazz claims that RCCL breached the Agreement by not

[4] Unless otherwise noted, the Court's findings are appropriate under Florida law and maritime law because the legal principles used to interpret contracts are materially similar under both standards. *See F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1356 (S.D. Fla. 2007) ("[G]eneral federal maritime law has adopted the general rules of contract interpretation and construction."); *Davis v. Valsamis, Inc.*, No. 16-17081, 2018 WL 4182116, at *3 (11th Cir. 2018) ("Maritime contracts 'must be construed like any other contracts: by their terms and consistent with the intent of the parties.'") (quoting *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 16 (2004)).

communicating vital information about the effect of the CDC's Notice. Alternatively, Capital Jazz argues that any breach by it was limited to cancellation of the jazz festival as it did not prevent RCCL from using the Ship. The parties dispute many of the factual allegations. *See* [ECF Nos. 181, 196, 183, 192].

**A. RCCL's Amended Complaint**

**1. Count I: Anticipatory Breach**

An anticipatory breach, also known as an anticipatory repudiation or constructive breach, is a breach of contract. *See* 23 Williston on Contracts § 63:29 (4th ed.). An anticipatory breach "is one committed before the time when there is a present duty of performance and results from words or conduct indicating an intention to refuse performance in the future." *Id.*; *see e.g.*, *Alvarez v. Rendon*, 953 So. 2d 702, 709 (Fla. 5th DCA 2007) (holding that a party breaches by anticipatory repudiation where a party engages in "words or acts evincing an intention to refuse performance in the future."). An anticipatory breach "consists of an outright refusal by a party to perform a contract or its conditions, or at least of some manifestation by one party to the other that the first cannot or will not perform some of its obligations under the contract." 23 Williston on Contracts § 63:29.

Both parties move for summary judgment on RCCL's anticipatory breach claim. However, summary judgment is precluded because a genuine issue of material fact remains as to who was the first to breach the Agreement by cancelling the Cruise. RCCL argues that Capital Jazz cancelled the Cruise at some point between January 5 and 7, 2022. In support, RCCL cites to Capital Jazz's January 5, 2022, email to the performers and artists, notifying them that the Cruise would not be moving forward. RCCL also argues that Capital Jazz breached the Agreement when it emailed its customers on January 7, 2022, informing them that "Capital Jazz has made the

decision to cancel next week's SuperCruise program." [ECF No. 152 ¶ 62]. According to Capital Jazz, its January 5th and 7th emails merely cancelled the *program*, but not the *sailing*. [ECF No. 183 ¶ 51]. The sailing, Capital Jazz argues, could have still occurred without the festival. Capital Jazz argues that, therefore, RCCL breached the Agreement first when it failed to communicate vital information to Capital Jazz, cancelled the January 10, 2022, conference call, and notified guests that the Cruise was cancelled through the RCCL mobile application.

The material facts and circumstances around the parties' communications between December 2021 and January 2022 are heavily disputed. Moreover, the parties put forth conflicting evidence, including emails, testimony, images, and documents purporting to show which party cancelled the Cruise first. Because genuine disputes of material fact exist as to who breached the Agreement first and whether a "program" and a "sailing" are materially different, the Court denies both parties' motions for summary judgment as to Count I.

**2. Count II: Breach of Contract**

"Maritime contracts 'must be construed like any other contracts: by their terms and consistent with the intent of the parties.'" *CITGO Asphalt Ref. Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1087 (2020) (quoting *Norfolk Southern R. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 31 (2004)). The elements of a breach of contract claim under federal maritime law are (1) a valid contract, (2) a material breach, and (3) damages. *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007); *Abbott Lab'ys, Inc. v. Gen. Elec. Cap.*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000) (recognizing that the same elements are required for a breach of contract claim under Florida law).

Both parties have moved for summary judgment on RCCL's breach of contract claim. RCCL argues that Capital Jazz breached the Agreement by failing to obtain and maintain insurance

coverage as required by Section 26.2.2 of the Agreement, which explicitly mandates that Capital Jazz obtain and maintain CGL insurance throughout the term of the Agreement. [ECF No. 164-1]. RCCL also argues that Capital Jazz breached the Agreement by failing to provide RCCL with an insurance certificate before entering into the Agreement as required by Section 26.4. *Id.*

The existence of a contract (the Agreement) between the parties is not disputed. However, the parties dispute what the terms of the Agreement cover and whether Capital Jazz's failure to obtain CGL insurance constitutes a material breach. Capital Jazz argues that it would be "nonsensical" to obtain and maintain CGL insurance years before the cruise and that the parties' prior course of dealing demonstrates that both parties understood the Agreement to require Capital Jazz to procure and provide proof of insurance by the sailing date of the Cruise, not years prior.

However, the Agreement's plain language required Capital Jazz to obtain and maintain CGL insurance throughout the term of the Agreement. "[W]hen the terms of a voluntary contract are clear and unambiguous, . . . the parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001) (internal quotation marks and citations omitted). Furthermore, where a contract is silent as to a particular matter, a court may not impose contractual rights and duties not contained in the contract. *See Gulf Cities Gas Corp. v. Tangelo Park Service Co.*, 253 So. 2d 744, 748 (Fla. 4th DCA 1971).

While there are no genuine issues of material fact that Capital Jazz breached Section 26.2.2,[5] RCCL's breach of contract claim fails on the issue of damages. RCCL seeks, "at minimum," nominal damages, [ECF No. 156 at 8]; but it has not shown any actual damages. Under

[5] The Court cannot find as a matter of law that Capital Jazz breached Section 26.4 because the requirements listed under 26.4 apply to the provisions in Sections 28.2 and 28.3 which are not mentioned in the Agreement or Amendments.

federal maritime law, courts have found that nominal damages may not be awarded.[6] *Tampa Port Auth. v. M/V Duchess*, 65 F. Supp. 2d 1305, 1307 (M.D. Fla. 1998) (collecting cases), *aff'd*, 184 F.3d 822 (11th Cir. 1999). "In light of the prohibition against nominal damages in admiralty actions," RCCL's claim for breach of contract premised on nominal damages is precluded. *Id*. As RCCL cannot establish the third element (damages) of its breach of contract claim, Capital Jazz is entitled to summary judgment on Count II of RCCL's Amended Complaint.

**B. Capital Jazz's Affirmative Defenses**

"An affirmative defense is one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters." *Adams v. Jumpstart Wireless Corp.*, 294 F.R.D. 668, 671 (S.D. Fla. 2013). Upon a plaintiff's motion for summary judgment on a defendant's affirmative defense, "the defendant bears the initial burden of showing that the affirmative defense is applicable." *Off. of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997); *see, e.g., Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 n.13 (11th Cir. 1990) ("Once a defendant shows that the applicable statute of limitations bars the claim, the burden shifts to the plaintiff to demonstrate that an exception or tolling provision applies."). "The defending party must rely on or submit record evidence in support of the purported affirmative defenses to create a genuine issue of material fact preventing the entry of summary judgment." *United States v. Marder*, 208 F. Supp. 3d 1296, 1318 (S.D. Fla. 2016) (quoting *Meth Lab Cleanup, LLC v. Spaulding Decon, LLC*, No. 14-3129-CIV, 2015 WL 4496193, at *7 (M.D. Fla. July 23, 2015)). "Only upon such a showing does the burden shift to plaintiff regarding that affirmative defense." *Thrift Supervision,* 985 F. Supp. at 1470. With the burden shifting to the

[6] Nominal damages may be awarded for breach of contract under Florida law. *MSM Golf, L.L.C. v. Newgent*, 853 So. 2d 1086, 1087 (Fla. 5th DCA 2003); *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1418 (11th Cir. 2011) ("Florida law does require an award of at least nominal damages if a breach of contract has been established."). However, Florida law does not apply here.

plaintiff, "[a] court may grant partial summary judgment on an affirmative defense if the plaintiff shows that the defendant cannot maintain the defense by a preponderance of the evidence." *Anderson v. Mascara*, 347 F. Supp. 3d 1163, 1175 (S.D. Fla. 2018).

**1. Failure to State a Claim**

Capital Jazz's Affirmative Defense No. 1 alleges that the Amended Complaint "fails to state a claim upon which relief can be granted." [ECF No. 34, ¶ 68]. Capital Jazz does not offer any facts or evidence raising a genuine issue for trial. A party raising an affirmative defense "must do more than make conclusory allegations." *Microsoft Corp. v. Jesse's Computers & Repair, Inc.*, 211 F.R.D. 681, 684 (M.D. Fla. 2002). Moreover, an affirmative defense "which simply points out a defect or lack of evidence in a plaintiff's case is not an affirmative defense." *Morrison v. Exec. Aircraft Refinishing, Inc.*, 434 F. Supp. 2d 1314, 1318 (S.D. Fla. 2005) (citing *In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988)). Therefore, summary judgment is granted in RCCL's favor as to Capital Jazz's First Affirmative Defense (failure to state a claim).

**2. Frustration of Purpose**

As its second affirmative defense, Capital Jazz asserts frustration of purpose. "The defense of frustration of purpose refers to the condition surrounding contracting parties where one of the parties finds that the purposes for which it bargained, and which purposes were known to the other contracting party, have been frustrated to the extent that the breaching party is not receiving the benefit of the bargain for which they contracted." *In re Maxko Petroleum*, LLC, 425 B.R. 852, 872 (Bankr. S.D. Fla. 2010) (citation omitted).

Here, the parties heavily dispute the *purpose* of the Cruise. Capital Jazz argues that RCCL knew that the purpose was to provide a music festival with entertainment and experiences. RCCL contends that the purpose of the Cruise "was the sailing of a cruise from Port Canaveral to the

Bahamas, to Curacao, to Aruba, and then back to Port Canaveral, for which Capital Jazz purchased, and could resell, the tickets." [ECF No. 165 at 9]. RCCL contends that the Agreement does not mention programming for a music festival or an enhanced entertainment experience, so that cannot be the purpose of the Cruise. Notwithstanding, Capital Jazz puts forth sufficient evidence to show that a genuine issue of material fact exists as to the purpose of the Cruise. Accordingly, RCCL's Motion for Final Summary Judgment is denied as to Capital Jazz's Second Affirmative Defense (frustration of purpose).

**3. Impossibility of Performance**

As its third affirmative defense, Capital Jazz asserts impossibility of performance. Under maritime law, the doctrine of impossibility of performance precludes liability for those cases where performance might be so difficult and expensive that it may be described as "impracticable." *Hellenic Lines, Ltd. v. United States*, 512 F.2d 1196 (2d Cir. 1975). Similarly, Florida law recognizes that "[t]he doctrine of impossibility exists 'where the purposes, for which the contract was made, have, on one side, become impossible to perform.'" *Harvey v. Lake Buena Vista Resort*, LLC, 306 F. App'x 471, 472 (11th Cir. 2009) (quoting *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. 2d DCA 1965)). "Although impossibility of performance can include extreme impracticability of performance, courts are reluctant to excuse performance that is not impossible but merely inconvenient, profitless, and expensive . . . ." *Valencia Ctr., Inc. v. Publix Super Markets, Inc.*, 464 So. 2d 1267, 1269 (Fla. 3d DCA 1985). Impossibility of performance "refers to the nature of [the] thing to be done—not the ability of the party to perform what he has agreed to do." *Lewis v. Belknap*, 96 So. 2d 212, 213–14 (Fla. 1957).

Capital Jazz argues that the spike in COVID-19 infections between December 2021 and January 2022 made it impossible to proceed with the Cruise safely. Moreover, Capital Jazz

contends that many of its performing artists, staff, volunteers, and production team began withdrawing due to health and safety concerns. The owner of the production company testified that multiple staff members withdrew and that he guessed that about seventy-five percent of his staff would have shown up for the Cruise. [ECF No. 183 at 3–6]. However, Hunte conceded in his testimony that, as of January 4, 2022, it was still possible for the Cruise to move forward as planned on January 14, 2022. [ECF No. 155-2 at 50:11-13]. While it was not impossible to move forward with the Cruise, a genuine issue of material fact remains as to whether Capital Jazz's performance was "extremely impracticable" to the point that it would absolve it of liability. Accordingly, RCCL's Motion for Final Summary Judgment is denied as to Capital Jazz's Third Affirmative Defense (impossibility of performance).

**4. Failure to Mitigate**

For its fourth affirmative defense, Capital Jazz asserts RCCL failed to mitigate its damages. Under maritime law, failure to mitigate damages is a valid defense. *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1286 (11th Cir. 2000). "Generally, the non-breaching party in a breach of contract action has a duty to mitigate its damages to prevent a party from recovering damages which could have been 'avoided without undue risk, burden, or humiliation.'" *Lady of Am. Franchise Corp. v. Arcese*, 2006 WL 8431025, at *7 (S.D. Fla. May 26, 2006) (quoting *Graphic Assocs., Inc. v. Riviana Restaurant Corp.*, 461 So. 2d 1011, 1014 (Fla. 4th DCA 1984)). Thus, "[m]itigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." *Grupo HGM Tecnologias Submarina, S.A. v. Energy Subsea, LLC*, 566 F. Supp. 3d 1219, 1235 (S.D. Ala. 2021), *aff'd*, No. 22-10425, 2023 WL 242546 (11th Cir. Jan. 18, 2023).

Capital Jazz argues that there were many things RCCL could have done to mitigate its damages, such as utilizing the Ship or crewmembers for another cruise. Capital Jazz's only supporting evidence consists of RCCL's discovery responses indicating that twenty-five cruises in January were cancelled, half due to ship unavailability or lack of crewmembers. However, Capital Jazz provides no evidence that RCCL could have utilized the Ship or its crewmembers for another cruise. Therefore, summary judgment is granted in RCCL's favor as to Capital Jazz's Fourth Affirmative Defense (failure to mitigate damages).

**5. Waiver**

As its fifth affirmative defense, Capital Jazz asserts that RCCL waived its rights under the Agreement by failing to provide Capital Jazz with "vital information" that RCCL knew would calm its concerns about the safety of the Cruise. "The general framework for waiver under federal and Florida law are . . . substantially similar." *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1359 (11th Cir. 2018). "Waiver is the voluntary, intentional relinquishment of a known right." *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994)). Under Florida law, "[w]aiver is either an intentional or voluntary relinquishment of a known right, or conduct giving rise to an inference of the relinquishment of a known right." *Sentry Ins. v. Brown*, 424 So. 2d 780, 784 (Fla. 1st DCA 1982). The question of waiver is generally a question of fact. *Id.*

Here, Capital Jazz has provided no evidence to show that RCCL intentionally or voluntarily relinquished any rights. At a minimum, Capital Jazz "must do more than make conclusory allegations." *Microsoft Corp.*, 211 F.R.D. at 684. And, as noted above, an affirmative defense "which simply points out a defect or lack of evidence in a plaintiff's case is not an affirmative defense." *Morrison*, 434 F. Supp. 2d at 1318 (citing *In re Rawson Food Service, Inc.*, 846 F.2d at

1349). Therefore, summary judgment is granted in RCCL's favor as to Capital Jazz's Fifth Affirmative Defense (waiver).

**6. Estoppel**

As its sixth affirmative defense, Capital Jazz argues estoppel based on RCCL's alleged misrepresentations. To prevail on an equitable estoppel defense, a party must demonstrate the following elements: "(1) the party against whom estoppel is sought must have made a representation about a material fact that is contrary to a position it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party seeking estoppel must have changed his position to his detriment based on the representation and his reliance on it." *See e.g., Watson Clinic v. Verzosa*, 816 So. 2d 832, 834 (Fla. 2d DCA 2002); *Marine Transp. Servs. Sea-Barge Grp., Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1139 n.8 (11th Cir. 1994) ("Florida's equitable estoppel law is similar to federal law on the subject."). "In order for equitable estoppel to arise, there must generally be some intended deception in the conduct or declarations of the party to be estopped by which another has been misled to his injury." *nVision Glob. Tech. Sols., Inc. v. Cardinal Health 5, LLC*, 887 F. Supp. 2d 1240, 1273 (N.D. Ga. 2012) (internal punctuation and citation omitted).

Capital Jazz has not presented any facts that would raise a triable issue with respect to its estoppel affirmative defense. Beyond simply alleging that RCCL misrepresented material facts upon which Capital Jazz relied, Capital Jazz has offered no argument as to the application of this defense to the facts of this case. Therefore, summary judgment is granted in RCCL's favor as to Capital Jazz's Sixth Affirmative Defense (estoppel).

**7. The Remaining Affirmative Defenses**

In its Seventh and Ninth Affirmative Defenses, Capital Jazz asserts breaches of obligations and prior cancellation of the Cruise, respectively, based on RCCL's alleged failure to prove its claims. "A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense." *In re Rawson*, 846 F.2d at 1349. Such a defense should be treated as a denial. *Vance v. Westfalia Technologies, Inc.*, No. 12-1902-CIV, 2013 WL 3270414, at 7* (M.D. Fla. June 26, 2013). As these affirmative defenses are "denials hidden in . . . affirmative defenses," *Vance*, 2013 WL 3270414, at *3, summary judgment is granted to RCCL on Capital Jazz's Seventh (breaches of obligations) and Ninth (prior cancellation of the Cruise) Affirmative Defenses.

As for its Eighth Affirmative Defense, Capital Jazz contends that any payments it must make to RCCL should be adjusted to account for the cost of the rooms reserved initially for Capital Jazz that RCCL intended to use as quarantine areas. However, Capital Jazz provides no legal or evidentiary support and abandons that affirmative defense by not responding to RCCL's arguments. Accordingly, summary judgment is also granted to RCCL as to Capital Jazz's Eighth Affirmative Defense (adjustment due to withdrawal of guestrooms).

**C. Capital Jazz's Second Amended Counterclaims**[7]

Both parties move for summary judgment on Count VI of Capital Jazz's Second Amended Counterclaims. RCCL also seeks summary judgment on Counts IV, V, and VII of Capital Jazz's Second Amended Counterclaims. The Court addresses each in turn.

**1. Count IV: Breach of Charter (Implied Warranty of Seaworthiness)**

A charter agreement is "a contractual arrangement whereby a ship owner agrees to lend a ship to a charterer for the transportation of goods from one port to another." *Internaves de Mexico*

[7] Count IV is titled "Breach of Charter", but as addressed by both parties, *see* [ECF Nos. 156 at 20, 185 at 21–24], it is recognized as a counterclaim for breach of the implied warranty of seaworthiness.

*s.a. de C.V. v. Andromeda Steamship Corp.*, 898 F.3d 1087, 1090 (11th Cir. 2018) (citing *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 228 (4th Cir. 2003)). A charter between parties is a maritime contract, which is interpreted in accordance with general common-law principles of contract law. "Maritime law infers a general warranty of seaworthiness from a charter-party agreement even where such warranty is not expressly made." *Horn v. Cia de Navegacion Fruco*, 404 F.2d 422, 428 (5th Cir. 1968). Unseaworthiness is ordinarily a question for the jury, and few cases find that a ship is unseaworthy as a matter of law. *Johnson v. Bryant*, 671 F.2d 1276, 1279 (11th Cir. 1982) (citations omitted).

The parties dispute whether the Agreement is a charter agreement and whether the implied warranty of seaworthiness applies. RCCL argues that the Agreement is not a charter agreement because it includes a provision stating that "[n]othing in this Agreement shall be construed as a charter . . . ." [ECF No. 164-1 at 21]. However, the Agreement also includes language explicitly referencing a charter program and describing the Cruise as a charter. [ECF No. 164-1 at 12, 32]. Moreover, the Amended Complaint explicitly refers to the Cruise as a "full ship charter" and "chartered voyage" subject to "the charter agreement." *See* [ECF No. 23]. Given the conflicting evidence provided by the parties, a genuine issue of material fact exists as to whether Capital Jazz chartered the Cruise. Accordingly, RCCL's Motion for Final Summary Judgment is denied as to Count IV of Capital Jazz's Second Amended Counterclaims.

**2. Count V: Breach of Warranty**

In Count V of its Second Amended Counterclaims, Capital Jazz asserts a claim against RCCL for breach of warranty based on Section 12.2 of the Agreement. Under maritime and Florida law, contracts must be enforced where the language is plain and unambiguous. *Norfolk*, 543 U.S. at 22–23; *Hahamovitch v. Hahamovitch*, 174 So. 3d 983, 985 (Fla. 2015). Section 12.2 states in

relevant part, "**Purchaser** warrants and represents regarding itself . . . to perform the functions contemplated by the Agreement . . . ." [ECF No. 164-1 at 13–14] (emphasis added). The Agreement, identifies Capital Jazz as the "Purchaser." [ECF No. 164-1 at 1]. Therefore, the plain language of Section 12.2 only applies to Capital Jazz's conduct, not RCCL. Because there is no genuine issue of material fact as to this issue, RCCL's Motion for Final Summary Judgment is granted as to Count V of Capital Jazz's Second Amended Counterclaims.[8]

### 3. Counts VI and VII: Breach of Contract[9]

Both parties move for summary judgment on Capital Jazz's Second Amended Counterclaims for breach of contract (Counts VI and VII). As to Count VI, Capital Jazz argues that RCCL anticipatorily breached the Agreement by ceasing communication with Capital Jazz less than a week before the sailing date and notifying passengers that the Cruise was cancelled. As to Count VII, Capital Jazz argues that RCCL's failure to timely respond to Capital Jazz's concerns breached the Agreement by frustrating Capital Jazz's rights to sell Cruise tickets, arrange equipment delivery, and provide status updates to guests, artists, and staff. As a result, Capital Jazz argues that RCCL's breach released Capital Jazz from its obligations under the Agreement. Similar to RCCL's anticipatory breach claim (Count I), these counterclaims (VI and VII) turn on *who* breached the Agreement first, for which there are genuine issues of material fact. Given the competing evidence and facts surrounding the parties' communications, the Court cannot determine whether RCCL's conduct breached the Agreement as a matter of law. Accordingly, the parties' motions for summary judgment as to Counts VI and VII are denied.

---

[8] Based on this finding as to Count V of Capital Jazz's Second Amended Counterclaims, RCCL's Motion for Judgment on the Pleadings as to Count V, [ECF No. 157], is DENIED as moot.

[9] Capital Jazz's Second Amended Counterclaims allege two separate counterclaims for breach of contract titled "Count VI." [ECF No. 47 at 23–26]. Both parties acknowledge that the second "Count VI" is to be construed as "Count VII." [ECF No. 203 at 13].

## IV. CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Capital Jazz's Motion for Summary Judgment, [ECF No. 153], is **GRANTED** as to Count II of RCCL's Amended Complaint;

2. Capital Jazz's Motion for Summary Judgment, [ECF No. 153], is **DENIED** as to Count I of RCCL's Amended Complaint and Count VI of Capital Jazz's Second Amended Counterclaims;

3. RCCL's Motion for Final Summary Judgment, [ECF No. 156], is **GRANTED** as to Count V of Capital Jazz's Second Amended Counterclaims and Capital Jazz's First, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Affirmative Defenses; and

4. RCCL's Motion for Final Summary Judgment, [ECF No. 156], is **DENIED** as to Counts I and II of its Amended Complaint, Capital Jazz's Second and Third Affirmative Defenses, and Counts IV, VI, and VII of Capital Jazz's Second Amended Counterclaims.

5. RCCL's Motion for Judgment on the Pleadings as to Count V of Capital Jazz's Second Amended Counterclaims, [ECF No. 157], is **DENIED as moot.**

**DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of March, 2024.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record